[Cite as *State v. Neal*, 2019-Ohio-793.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 107210**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**HEATHER NEAL**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-620009-A

**BEFORE:** Jones, J., S. Gallagher, P.J., and Keough, J.

**RELEASED AND JOURNALIZED:** March 7, 2019

**ATTORNEYS FOR APPELLANT**

Mark A. Stanton
Cuyahoga County Public Defender

BY: Jeffrey Gamso
Assistant County Public Defender
310 West Lakeside Avenue, Suite 200
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY: Kevin E. Bringman
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113


LARRY A. JONES, SR., J.:

{¶1} Defendant-appellant Heather Neal ("Neal") appeals her burglary and theft convictions that were rendered after a bench trial. For the reasons that follow, we affirm.

{¶2} In August 2017, Neal was charged with one count of burglary, a felony of the second degree, and one count of theft, with a furthermore clause that the victim was elderly, a felony of the fifth degree. Prior to the January 2018 bench trial, the state amended the burglary charge to a felony of the third degree. The trial testimony established the following facts.

{¶3} The victim in this case was Gene Hurley ("Hurley"), an elderly, relatively recent widower. Shortly after Hurley's wife died, Hurley met Neal, who was significantly younger than Neal, and the two began a relationship. Hurley's children, and in particular his daughter Tina Faykus ("Faykus") who testified at trial, did not approve of the relationship. At all

relevant times, Hurley lived in the same house he had shared with his wife and had lived in it for approximately 40 years. During the course of living in the house, he developed and maintained good relationships with his neighbors.

{¶4} On the date of the incident giving rise to the charges in this case, July 21, 2017, Hurley was in Pennsylvania visiting his son. One of Hurley's neighbors, Jerome Sandford ("Sandford"), testified that he lived across the street from Hurley. Sandford testified that he had a clear view of Hurley's back yard from his own house.

{¶5} On the day in question, Sandford was sitting on his own porch when he observed Neal at Hurley's house "going back and forth. You know, coming from the driveway going back and just looking at the door trying to get in some kind of way * * *." According to Sandford, there was a car parked in Hurley's driveway; there was a man in the car who remained in it. This scene caught Sandford's attention because he knew Hurley was out of town.

{¶6} Sandford went over to Hurley's house and confronted Neal; Neal told him that she was locked out of the house and she wanted to get her clothes from inside. Sandford returned to his porch and then saw Neal stand on a crate by a back window and try to gain entry. Sandford then went back to Hurley's house and again confronted Neal, telling her she was not supposed to be there. Neal again told Sandford that she wanted to get her clothes from inside the house. Sandford started to walk back to his house and told Neal that he was going to call the police. Neal told him that she was going to leave.

{¶7} However, when he returned to his porch, he saw Neal coming out of the side door of Hurley's house, holding something black and square, about the size of a DVD player. She "jumped * * * into the car and they took off." Sandford testified that Neal did not have any clothes in her hands upon coming out of Hurley's house; she only had the black, square box.

**{¶8}** Hurley testified that he met Neal approximately a year and a half after his wife had passed away — he met her while walking down Lorain Avenue in Cleveland. He described their meeting and relationship as follows: "Well, I talked to her and after awhile we went out to dinner, a couple of days after that. I got her telephone number. She would come over to the house and clean it for me, washed my clothes, cleaned the house." According to Hurley, when they would go out, he would pay and give her money for "cigarettes and stuff like that." Hurley testified that he knew his daughter, Faykus, was worried about him being in a relationship with Neal.

**{¶9}** Relative to the incident, Hurley testified that he told Neal that he would be away on the subject weekend prior to leaving. At that time, Neal had some of her clothes in his house. He testified that he had a TV and a DVD player in his living room. When he returned from his trip to Pennsylvania, the TV was gone, but the DVD player was still there. According to Hurley, no one, including Neal, had permission to take his TV. He told Neal, prior to his leaving, to "get her clothes for three or four days, because I'm going to be out of town."

**{¶10}** Hurley testified that he learned that his house had been broken into while he was still in Pennsylvania, and upon learning, he immediately came home. Neal was captured at Hurley's house on the day in question by a neighbor's surveillance video.

**{¶11}** Hurley's daughter, Faykus, also testified. According to Faykus, one day in July 2017, she received a phone call from one of her dad's neighbors telling her that Hurley was out of town, but that the front door to his house was wide open. Faykus went to Hurley's house, locked the front door, and secured a window where the screen had been pushed into the house.

**{¶12}** Faykus testified that the following day she received yet another call from a different one of her dad's neighbors about the house. She went to the house and saw that a TV

and DVD player were missing. She called the police. While the police were at the house, Sandford went to the house to explain what had happened earlier that day.

{¶13} The investigating detective, Thomas Manson ("Detective Manson"), testified that he interviewed Hurley, who stated that he did not give anyone, especially Neal, permission to enter his house or take any of his possessions.

{¶14} On this evidence, the trial court found Neal guilty of both counts and sentenced her to two years of community control sanctions. Neal now appeals, and in her sole assignment of error challenges the convictions as being against the manifest weight of the evidence.

{¶15} When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A judgment should be reversed as being against the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶16} Neal contends that Faykus's testimony was incredible because she had incentive to lie, given that she did not like Neal. That is a credibility determination, and it is well established that the credibility of witnesses are primarily for the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Neal also cites to the confusion in the testimony about what was taken — a TV, a DVD player, or both — as grounds for reversing the convictions. We disagree. The testimony of Sanford, Faykus, Hurley, and

Detective Manson all establish that while Hurley was out of town, and without his permission, Neal trespassed on his property, broke into his home, and stole either a TV or a DVD player. This is not the exceptional case where a new trial must be ordered. The weight of the evidence supports the convictions. The sole assignment of error is therefore overruled.

{¶17} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., JUDGE

SEAN C. GALLAGHER, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR